No. 16,579.

PEOPLE OF THE STATE OF COLORADO *v.* DOLPH.
(239 P. [2d] 312)

Decided December 17, 1951.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAW-RENCE HINKLEY, Deputy, Mr. BERT M. KEATING, Mr. MAX D. MELVILLE, for the people.

Mr. FREDERICK E. DICKERSON, Mr. ANTHONY F. ZAR-LENGO, for defendant in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Defendant in error, to whom we hereinafter refer as defendant, or by name, was accused of crimes by information containing four counts filed in the district court of the City and County of Denver.

In count one he was charged with the completed crime of obtaining the sum of $500.00 by means of false and fraudulent representations. This count was withdrawn by the prosecution during the progress of the trial and accordingly we consider it no further.

In count two, it was charged that, "H. C. Dolph on divers dates beginning February 20, 1949 and continuing to March 15, 1949," did attempt to induce one Aziel Stein to "give, deliver, hand over and pay" the sum of $1,-000.00 by means of false and fraudulent representations alleged to have been made by said defendant.

By count three, it was alleged that during the period of time above mentioned, "H. C. Dolph did unlawfully and feloniously attempt to obtain from Aziel Stein, Five Hundred Dollars ($500.00) in money," by means and by use of the confidence game.

It was alleged in count four that defendant attempted to obtain the sum of $1,000.00 by means and by use of the confidence game.

Defendant entered pleas of not guilty. The cause proceeded to trial to a jury, and, at the conclusion of the evidence offered on behalf of the people, counsel for defendant moved for a directed verdict of not guilty upon all three counts of the information, upon the ground that the evidence failed to support any charge contained in the information, and for the further reason, as to the second count, that the alleged crime of attempt to obtain money by false pretenses is nonexistent in Colorado.

The trial court sustained the motion; directed the jury

to return a verdict of not guilty as to all counts; and judgment of dismissal accordingly was entered. The District Attorney seeks reversal of this judgment by writ of error.

The defendant, at all times material in this case, was a member of the city council of the City and County of Denver, State of Colorado, and represented the councilmanic district in which Aziel Stein lived, and within which was located the Continental Drug Store for which a liquor license was sought.

Counsel for the people have set forth in their brief an abstract of the evidence, which we have carefully examined and adopt as a fair statement of what the evidence tended to prove.

Stanley Stein and Arthur Olsen, owners of the Continental Drug Store in Denver applied to the Manager of Safety, as the liquor licensing authority, for a drugstore liquor license, and on January 18, 1949, the Manager held a hearing on their application.

After the hearing, the Manager called Dr. Dolph, the defendant, who was the councilman for the district in which the drugstore was located, and asked if he had any information that the Manager should know about the applicants, the neighborhood and the issuance of the license. Dr. Dolph said he would look around, and call the Manager later.

Either the same or the next day, Dolph called Aziel Stein, father of Stanley Stein, and asked him why the "boys" applied for a liquor license without Dolph's knowledge. Stein went to see Dr. Dolph and told him he thought the "boys" were entitled to a license. Dolph said, "I can be either for it or against it," and Stein said he did not see why Dolph should be against it.

About February 12 or 13, Aziel Stein called Dr. Dolph to ask about the license. Dolph said he had heard nothing, but to call him at the end of the week. Stein did not call, but Dolph called him the following Saturday evening, wanted to know why Stein had not called, and

asked him to come and see him. Stein arranged to meet him the following morning at Dolph's home. During the ensuing rather lengthy conversation, Dolph remarked several times, "It ought to be worth something to you." He also said, "You know, I did a friend a favor once. He sent me a case of liquor, and I examined the case of liquor, and I got on the phone and called him and asked him if he had any rubber bands in the office. He said he had, and I told him to wrap them around a couple hundred-dollar bills." Stein said that what money he had was connected in his own store, and he was sure that if the boys had any they wanted to build up their stock. Stein left the house and Dolph followed him, saying, "I'll let you know some time. Can I call you?" Stein replied, "Let me know Wednesday or Thursday." Dolph called Stein later and asked if he had heard about the license. Stein said he had not. Dolph asked, "Have you seen your partner yet?" and Stein said, "I don't know yet."

About March 1, 1949, Dr. Dolph called on the Manager and was asked whether there was anything the latter should know about the Continental Drug Store. Dolph explained the operation and then asked if the Manager knew that one of the applicants was related to Aziel Stein of the Pencol Drug Store. The Manager replied that he did; that Stein had appeared at the hearing and said he had given Stanley, one of the applicants, the money with which to go into business.

At the visit on March 1, Dr. Dolph asked the Manager if he knew what he was going to do with the application and was told that the latter saw no reason why the license should not be granted, but wanted to make an exhaustive investigation. The Manager thought, he told Dolph, he would clear up the matter in a few days.

About March 3, 1949, Aziel Stein called Mr. Radetsky, administrative assistant to the Mayor of Denver, and as a result there was a meeting on the evening of March 4 which included the Mayor, the Manager, Aziel Stein,

Radetsky and the representatives of the District Attorney's staff.

On March 7 or 8, 1949, Dr. Dolph called the Manager to ask if the investigation had been completed. The latter said it had not, but that, while not definitely sure, he saw no reason why the license should not be issued. As a matter of fact, at that time, the Manager had decided that the license would be granted.

On March 10, 1949, about 11:00 o'clock a.m., Stein, with Radetsky listening, telephoned Dr. Dolph, saying he had not heard about the license. Dolph replied, in effect, "I know you haven't; it's being held up"; and he asked Stein why he had not gotten in touch with him, and whether Stein had seen his partner. Dolph also said that he could do nothing about the matter at the moment because a "certain party" was out of town, but that he was going to town that afternoon.

On the afternoon of March 14, 1949, Dr. Dolph called the Manager, inquired about the license, and was told it would be issued in a day or two. Dolph asked whether it definitely was to be issued, and the Manager said that it was.

On the following morning, March 15, Stein, with Humphreys, Chief Investigator for the District Attorney, listening, telephoned Dr. Dolph and asked when he could see him. In response to Dolph's question, "How about lunch?" Stein said he could not get away, and added, "How about your coming here?" Dolph replied, "No, there's no place to talk to you in private over there." Stein said, "How about my basement?" and Dolph answered, "Oh, a basement? Yes. A basement. That's o.k. I'll be over about noon."

At 12:30 p.m., Dr. Dolph arrived at Stein's store. Stein said he was sorry he had no private office, but they could talk in the basement. They eventually went to the stock room there. Dolph looked back and forth into the aisles. Two investigators for the District Attorney were concealed behind shelves.

In response to Stein's query as to the license, Dolph asked if he knew the worth of a license. Stein thought $150, but Dolph said it was worth $500 to $600 a year; that the boys applied because they needed it. Stein asked what the license was to cost him. Dolph replied that So-and-So would charge around $500 to $700, and that some had paid as high as $7,500. Stein said he was not going to pay that much, and said, "Doctor, what is it going to cost me?" Dolph said Stein might give him a present. Stein said he had talked with his partner and had $500 in his pocket. Dolph stated, "Well Ace, you can give me a present of five hundred from you and five hundred from your partner."

Stein asked whether he was sure to get the license if he paid the money. Dolph held out his hand, saying, "I got it in the palm of my hand." Stein asked if he was sure, and Dolph replied that he was. Dolph walked away, saying, "Excuse me a few seconds," and then returned. Stein gave him the $500. Chief Investigator Humphreys then stepped out and arrested him and identified the money.

Before leaving the basement, Dolph said to Investigator Tormey, "This is going to ruin me. Any way we can fix it up right here?" Tormey replied that they were going to the District Attorney's office.

At that office, the assistant district attorney asked for an explanation, and Dolph said it was a surprise to him; he said he thought the money "was a gift." When asked if it was his habit to take gifts of that size, and what he had done that Stein should give him such a gift, Dolph replied, "He wanted a license and I was trying to help him out." When asked if he was the liquor licensing authority, he said he could answer yes and no. He said he did not mean that the Manager would issue or refuse a license at his word, but meant "they generally talk to us and ask us about it." When asked why Stein should make him a gift of $500 if he was not the liquor licensing

authority, Dolph replied, "Well, I was trying to help him, and I hadn't done anything to prevent him getting it."

Stein testified that he thought the Manager was the licensing authority, but that his first conversation with Dolph made him believe that Dolph had a right, or almost the authority, "to see whether I had a license for the boys or not," and that he believed, and continued to believe for some time, on that representation, learning only at the meeting at the Mayor's house that Dolph had nothing to do with the obtaining of a license; that up to the time of that meeting he had believed that Dolph could influence either for or against the license.

In response to the question, "And yet you claim you thought Dr. Dolph was the licensing authority?" Stein answered, "I didn't say I claimed he was the licensing authority. I claim he had influence in declining or making the license."

Questions to be Determined.

First: *Are there sufficient facts alleged in the second count of the information, which charged only an attempt to obtain money by false pretenses, to charge defendant with an offense against the laws of Colorado?*

 This question is answered in the negative. Counsel for the People admit that the factual situation presented does not fall within the prohibition of any statute enacted by the legislature of this state. It is contended, however, that under the common law of England, as adopted by Colorado, an attempt to obtain money by false pretenses was indictable as a crime. The English case of *Rex v. Serlestead,* 1 Latch 202, decided in 1625, is the only case cited as establishing the existence of such a crime under the common law of England. There is no showing that the offense of attempt to obtain money by false pretenses was known to the common law of England as of the year 1607. It was the common law and acts of parliament in aid thereof as existing in that year, "and not beyond that date, that have been approved and enacted by the legislature of Colorado."

*Denver Jobbers' Ass'n v. People,* 21 Colo. App. 326, 122 Pac. 404; *Dockerty v. People,* 96 Colo. 338, 44 P. (2d) 1013.

 Fundamental concepts of decency, and every dictate of ethics, morality and conscience, may sometimes be violated and wholly disregarded by conduct which no law forbids. Accepting the evidence offered by the people at face value, as we are obligated to do in considering the record before us, we have a case of that kind, and nothing more. It is not the function of the judiciary to create offenses unknown to the law in order to mete out punishment to one whose conduct is offensive to codes of honor and morality alone. Until the legislature prohibits the act and fixes the penalty, there is no crime committed by one who unsuccessfully attempts to obtain money or other thing of value by means of false pretenses.

 Second: *Did the trial court err in holding that an essential element of the crime of attempt to obtain money by means of the confidence game was lacking, in that no false or bogus instrument or device, as distinguished from mere words, was used by defendant?*

This question is answered in the negative. There can be no doubt concerning the law in this jurisdiction as to whether a bogus or false instrument, token, or device, is essential to establish the guilt of an accused upon a charge based on the confidence game statute. We have held repeatedly that mere words are not sufficient to warrant a conviction under that statute. Typical of the expression of this court upon the point is the following language from our opinion in *Wheeler v. People,* 49 Colo. 402, 113 Pac. 312: "To constitute the offense, the money or property must have been obtained, or the attempt thereto made, by some false or bogus means, token, symbol or device, as distinguished from mere words, however false and fraudulent." This rule has been recognized and applied under varying circumstances in the following cases decided by this court.

*Powers v. People,* 53 Colo. 43, 123 Pac. 642; *Roll v. People,* 78 Colo. 589, 243 Pac. 641; *Chilton v. People,* 95 Colo. 268, 35 P. (2d) 870; *Davis v. People,* 96 Colo. 212, 40 P. (2d) 968; *Peiffer v. People,* 106 Colo. 533, 107 P. (2d) 799; *Shepherd v. People,* 109 Colo. 582, 129 P. (2d) 104; *Kelly v. People,* 121 Colo. 243, 215 P. (2d) 336; *Munsell v. People,* 122 Colo. 420, 222 P. (2d) 615.

No questions, other than those hereinabove considered, are presented by the record. Accordingly the judgment is affirmed.

MR. CHIEF JUSTICE JACKSON and MR. JUSTICE KNAUSS did not participate.